# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## TILLEY v. COMMONWEALTH.

### JULY 6th, 1893.

MURDER—*Suspicion not Proof—Case at Bar.*—In case at bar, HELD, that though the facts certified in the record present strong grounds of suspicion against the prisoner, yet they are not sufficient to establish beyond a reasonable doubt the prisoner's guilt of the crime for which he stands indicted.

On rehearing of the case of *Tilley* v. *Commonwealth*, reported in 89 Va., 136.   Opinion states the case.

*Walker & Caldwell*, for prisoner.

*Attorney-General R. Taylor Scott*, for commonwealth.

HINTON, J., delivered the opinion of the court.

The prisoner, Robert L. Tilley, was tried in the circuit court of Carroll county for the murder of one Louisa Haynes. He was found guilty of murder in the first degree and sentenced to be hanged.   His case was then brought, by writ of error, to this court, where the judgment of the circuit court was affirmed on the 23d of June, 1892.   See 89 Va., p. 186. That decision having been rendered by a court of three judges, it was deemed best, in view of the gravity of the crime and peculiar circumstances of the case, to order a rehearing; and it has accordingly been reheard before a full bench.

The material facts are these: In the month of November, 1887, the prisoner, accompanied by a brother, Joe Tilley, came from Kentucky to Bristol, Tenn., on his way to visit his mother, who lived in North Carolina near the Virginia line. When they reached Bristol they heard that Littell Haynes and his family, including a single daughter, Lou, were living there. The Tilleys were old acquaintances of the Hayneses, having lived in the same neighborhood in Carroll county, Virginia, and they visited the family in Bristol. They reached Bristol on Wednesday or Thursday; and on Saturday the prisoner and his brother, with Lou Haynes and a girl named Sue Dean, started together to visit their friends in Virginia and North Carolina. The prisoner paid Lou Haynes's railroad fare to Wytheville, and his brother paid Sue Dean's. They remained in Wytheville during the day of Saturday, and in the after- noon Joe Tilley left the party and reached his mother's home on Sunday evening. The others stayed in Wytheville all night and left on Sunday morning. The "prisoner bought a new pair of gaiter shoes *in Bristol* of fine quality, with very narrow toes and very small heels, and * * had no other shoes," and, it is proved, "wore those gaiters on the day Lou Haynes was killed." The prisoner and the two girls camped out Sunday night near Carroll Courthouse, and on Monday got breakfast at the hotel at the Courthouse, the deceased pay- ing the bill. From the Courthouse the three went on foot to the residence of James Dean, an uncle to both girls, who re- sided on the Fancy Gap road about two miles from the State line. At that point the prisoner left them. The two girls stayed at James Dean's until the next morning, when they went into North Carolina about a mile or two over the line, and the deceased went to the house of one McMillan, and the other girl to the house of one Phillips. The prisoner reached his mother's house on Monday evening. On the next morning he had $300 in money. The deceased remained at McMillan's until Wednesday night after dark, when she left,

and about 8 or 9 o'clock in the night came to the house of Phillips after the family had retired. Although the family had retired, when she knocked some one got up and let her in. A few minutes after the prisoner and his brother came to the house and remained until 10 or 11 o'clock, and then left, while the deceased remained all night. The next morning— that is, Thursday—a man named John Day came to Phillips' house, and after deceased started to go back to McMillan's house and had gone fifteen steps, he, Day, called to her. They had a short conversation, and went a very short distance together and then parted, going in different directions. When the deceased left Phillips' house on that fatal Thursday morning, she said she was going to Jeff McMillan's and Margaret Myrick's. It does not appear whether Day heard her say or knew in what direction she was going, but it is proved that the old wood road, to be hereafter spoken of, was the nearest way from the Green Hill road (154 yards from which the deceased was found dead) to Margaret Myricks. On that Thursday morning, *after* the deceased had left Phillips' house, and about 9 o'clock A. M., the prisoner came there and stayed a short while and left. About the middle of the forenoon the prisoner was on the Fancy Gap road; in North Carolina, talking to Sue Dean and Mary Phillips, when two men were seen coming up the road. Some one said that one of them was Fulton, a person with whom the prisoner had had a serious difficulty several years before, whereupon the prisoner pulled out a large pistol from his hip pocket and put it into his breast pocket, remarking, "If Fulton raises a fuss with me, I will make d——d short work of him." The deceased remained at McMillan's house on Thursday until after dinner, and soon after she, accompanied by Eliza McMillan, walked up the Fancy Gap road towards the Virginia line; that between McMillan's and the line, they were joined by the prisoner and his two brothers, James and Joseph Tilley, and that all five went as far as the State line, *laughing and talking*. They all remained seated on a

chestnut log for some time.  While they were seated there a man named Smith sold one of the party some chestnuts, and then drove on along the Fancy Gap road into Virginia, and when he had gotten within two hundred yards of where the Green Hill road leaves the Fancy Gap road—that is, when he had gone about three-fourths of a mile north from the chestnut log—"he heard the loud report of a rifle or large pistol in the direction of where the body was found, which he took to be the report of a *rifle* fired by some hunter."  Between 3 and 4 o'clock P. M. the deceased and the prisoner started up the Fancy Gap road into Virginia and the other three went back into North Carolina.  It was in proof that on *Wednesday* the deceased had thirty dollars in paper money and some silver coin in a velvet purse, which she carried on her arm by a steel chain, but there is no proof whatever that she had the purse or any money whatever on her person at any time on Thursday.  The last that was ever seen of the deceased alive was when she left the chestnut log in company with the prisoner, who was next seen about sundown, or a little before, about one mile from where the body was found, walking rapidly along the Green Hill road in the direction of his mother's house, which was about one-fourth of a mile distant.  He passed within ten steps of several persons who were gathering corn, but did not speak, or seem to care to speak, and one witness said: "He rather turned his head away."  None of the parties knew him except a boy, who had seen him at the school house the day before.

The account of the finding of the body is as follows: On the evening of Thursday, November 17, 1887, a Mr. Coe, who lived 200 yards from the spot where the body was found, discovered that the woods were on fire on Mr. Short's land.  He dispatched a messenger for Short, and went himself with his boys and surrounded the fire, which had burnt over about three-quarters of an acre or an acre of ground.  When Short came they went back to the fire and saw the body of the de-

ceased lying in the lap of a tree about a foot from the ground, face downward, with a large bullet hole in the top of her head, which came out in the jaw. Her limbs were nearly all burned off and most of the flesh off her head and face. A number of buttons and a breastpin and other portions of her dress were raked out of the ashes under her body, but no silver or steel chain or finger rings were found. These charred remains were lying, as we have said, on the lap of a tree which had been blown up by the roots about three-fourths of a mile from the Fancy Gap road and 154 yards from the Green Hill road, in a secluded hollow in the woods by the side of an old road used by the owner of the lands as a wood road. It was proved that the body was the body of Lou Haynes; that when found it was lying on the face with the left arm under the body and the right drawn back behind the body. It was also proven that death was caused by the bullet wound.

A diagram of the *locus quo* shows that the State line forms with the Fancy Gap and Green Hill roads almost a right triangle, of which the Fancy Gap road may be called the altitude, the State line the base, and the Green Hill road the hypothenuse. From the chestnut log at the intersection of the Fancy Gap road there was a blind path which came out into the Green Hill road some 150 or more yards nearer the Fancy Gap road than the old wood road, in which the body was found, and the old wood road came into the Green Hill on the opposite side.

There was found on the Green Hill road, on the morning after the murder, between the point where the wood road on which the body was found, left the Green Hill road and in the direction of the Fancy Gap road, for a distance of about 200 yards, the tracks of a man and woman on opposite sides of the road going in the same direction and towards the old wood road, but no tracks were seen on the wood road. The woman's track was a No. 4 shoe, and the man's track an 8 or 9, and looked as if

made by a heavy brogan boot or shoe; and there were also seen at the same time the tracks of two men along the same distance, and also again near Fancy Gap road going in the opposite direction from the woman's track, and that all three of the men's tracks were about the same size and general appearance. It was also shown that from the State line to where the body of the deceased was found, by the roads was over one and a half miles. It was proven that a witness, one Luther Coe, just at 4 o'clock on the evening of the murder heard a cry "Oh!" coming from the direction in which the body was found, and in a minute after he heard the report of a gun or pistol in the direction of the cry. That the cry was not the cry of one in pain, distress, or alarm, but just a low cry of oh!

The body being found, an inquest was held the next day, and the verdict of the coroner's jury was that the deceased came to her death from the effects of a pistol wound in the head, fired by the prisoner.

A hundred or more people attended the inquest, and strong threats were made of lynching the Tilley boys, especially the prisoner, some persons going far enough to twist hickory withes into a rope with which to hang the prisoner if he should be brought to the spot.

A posse of men were verbally directed by a justice of Carroll county to go to the house of the prisoner's mother in North Carolina, about two and a half miles from the spot where the body was lying, and arrest the Tilley boys—James, Joseph, and the prisoner. They went to the house and found the family at dinner in the cellar, which was used as a dining room. Joe Tilley had just finished eating when the men arrived, and he went out first and invited them into the house. James Tilley next went up stairs. As soon as Joe Tilley and the men got into the house the leader of the men said: "I arrest you, Bob Leake Tilley, for the murder of Lou Haynes." These words were heard by Mrs. Gordon, who was in the cel-

lar, and probably by the prisoner, as they were uttered in a tone loud enough for any one to hear. And this was the first time, so far as the record discloses, that he ever heard that Lou Haynes had been killed and that he was suspected of the murder. The prisoner, who had spent the preceding night at his mother's in North Carolina and the morning at Green Hill, N. C., was eating his dinner when the party came to arrest the Tilley boys, and was left in the cellar or dining room when the rest went out, and was not seen again until dark, when he came into the yard of his mother's house, where he was met by his mother, his step-sisters, and C. F. Taylor, who told him he would be hung by a mob if arrested, and to leave the country at once, and under these circumstances he fled to Kentucky and went under an assumed name. He was arrested in the month of September, 1890, brought back to Carroll county and lodged in jail, where, although he seems to have been treated with the greatest harshness, he made no effort to escape. Indeed, on one occasion, when a lot of tools had been given him by another prisoner, with which he might have made his escape, he sent for his attorney and gave them to him.

Now upon this state of facts, for it must be observed that it is the *facts proved*, and not the evidence merely, which are certified, is it established beyond a reasonable doubt that the prisoner killed the deceased? We think not. That there are circumstances which afford strong ground of suspicion cannot be denied. But circumstances of suspicion merely, without more conclusive evidence, have never been held sufficient to justify conviction. Where, indeed, all the circumstances of *time*, place, motive, means, opportunity, and conduct, says a learned author speaking of circumstancial evidence, concur in pointing out the accused as the perpetrator of the crime, it must produce a moral, if not absolute, certainty of guilt. 1 Starkie, 494. *Dean's Case*, 924.

But do they all concur in the present case? The *corpus delicti*, to be sure, is clearly proven by the position of the hands, the character and location of the death wound, and the very efforts made to conceal the mode and manner of her death; but where do we find any evidence of motive? The commonwealth says it was robbery. But where is there to be found the slightest proof that on the day of her death she had on her person anything which could excite his cupidity, even if we assume that such was his purpose, or why should we suppose that such was his purpose, when he was not only not in want of money, since he is proven to have had $300 himself, but when, from the manifest terms of intimacy which existed between them, it seems more than probable that he might have had any mere property she possessed for the asking. Of course, then, if what has been just said be true, the suggestion that robbery was the prisoner's motive, amounts to nothing more than the barest conjecture. Again, acts of flight, concealment and falsehood, "and many other *ex post facto* indications of mental emotion" are usually regarded as strong presumptive evidences of a consciousness of guilt, but in this case all these circumstances may be readily accounted for by the fact that the prisoner had every reason to believe that if he was tracked and overtaken he would be instantly hung without judge or jury. Fear, it must be remembered, may spring from causes very different from that of conscious guilt. " A person, however conscious of innocence, might not have the courage to stand a trial, but might, although innocent, think it necessary to consult his safety by flight," said Justice Abbott once in delivering his charge to a jury. If this be so, and no one can doubt it, how great must have been the prisoner's incentive to flight when he was advised by mother, step-sister, and a friend that he would never be allowed to stand his trial, but would be hung on the spot. Wills on Cir. Ev., p. 89. Very different, however, was his

conduct while in prison, after all fears of the mob had passed away; when, although he had been provided by a fellow prisoner with the means of making his escape, he sent for his counsel and handed the tools over to him.

And then as to his conduct, what is there in it except his flight, which has already been explained, that could be objected to? From Thursday about sundown to the time of the attempted arrest he had been in North Carolina several miles from the scene of the inquest, and for aught that appears in the record, knew nothing of it, and therefore could not be expected to be found among those who were in pursuit of the criminal.

But where is the proof of either opportunity or means? Is it anywhere shown by a track or otherwise that he was ever nearer than a half mile of the scene of death? or is it anywhere shown that the killing was done with a pistol rather than a gun? On the contrary, is it not patent from the testimony of all three of the witnesses who testify on the point that they thought the report which they heard was produced by the discharge of a gun, and not of a pistol. Indeed, while all of them say it was produced by a *gun* or a pistol, the witness Smith says that "he took it to be the report of a *rifle* fired by some hunter."

Now in the absence of all these inculpatory circumstances, without a single circumstance to connect him with the killing, with the track of the only person who seems to have been walking with a woman indicating a different person, ought we to infer from the mere facts that he was the last person seen with the deceased at a distance of one and a half miles from the spot where the body was found and has failed to give an account of the circumstances under which he left her, and the fact that he was seen a short time after *the supposed time of the killing* on the road which leads by, and within 154 yards of the place where the body was found, that he was the murderer?

We think not. These circumstances, in our judgment, do make out a case of grave suspicion, but do not prove beyond a doubt that the prisoner was the murderer.

It follows that the judgment of the circuit court of Carroll must be reversed and the case must be remanded for a new trial to be had therein.

LACY, J., and FAUNTLEROY, J., dissented.

JUDGMENT REVERSED.