## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

### CANTER V. COMMONWEALTH.

#### June 19, 1918.

1. CRIMINAL LAW—*Presumption of Innocence.*—One charged with crime is presumed to be innocent, and that presumption follows him throughout every stage of the trial.

2. CRIMINAL LAW—*Presumptions and Burden of Proof—Reasonable Doubt.*—The burden of showing the guilt of the prisoner to the exclusion of every reasonable doubt is upon the Commonwealth, and this burden never shifts and always rests upon the prosecution. While the Commonwealth may prove such facts as may raise the presumption of guilt unless they are rebutted by the accused, still after the evidence is closed, if upon a consideration of the whole there is a reasonable doubt of his guilt, the jury should acquit.

3. HOMICIDE—*Evidence Necessary to Sustain Conviction—Reasonable Doubt—Case at Bar.*—The facts adduced by the prosecution to convict the accused, considered collectively as they must be when circumstantial evidence is relied on, are just as consistent with his innocence as with his guilt, and when this is true, that interpretation which acquits him must be adopted, for it is fundamental that if there be a reasonable doubt of his guilt there can be no conviction. After six trials the Commonwealth has failed to produce evidence sufficient to sustain a conviction. Suspicion cannot be substituted for proof, and upon this evidence the accused is entitled to an acquittal.

Error to a judgment of the Circuit Court of Washington county.

*Reversed.*

The opinion states the case.

*N. P. Oglesby,* for the plaintiff in error.

No appearance for the Commonwealth.

PRENTIS, J., delivered the opinion of the court.

This case is before this court for the second time. *Canter v. Commonwealth*, 118 Va. 800, 88 S. E. 327.

Upon the previous record the Attorney-General and the assistant Attorney-General confessed error in this court, and the judgment condemning the accused to death for the murder of Maude Wilson was reversed. At that time it was said: "We have carefully examined the evidence and concur in the view expressed by the Attorney-General and his assistant, that it is inadequate to connect the prisoner with the crime with that degree of certainty required by the criminal law of this Commonwealth."

While there are some substantial variations in the evidence in the record now to be considered from the previous record, still the incriminating circumstances relied upon by the Commonwealth are in substance identical and the variations in the testimony are not sufficient to justify a different conclusion. Since the case was here, the prisoner has been tried five times, and four carefully selected juries have failed to agree upon a verdict and were, therefore, discharged. Upon his sixth trial he was found guilty of murder in the first degree and sentenced to confinement in the penitentiary for life. That judgment is before us for review upon the prisoner's motion to set aside the verdict and grant him a new trial, upon the ground that the evidence is insufficient to sustain the conviction.

Mrs. Wilson was murdered under circumstances which naturally inflamed the public mind and which justly aroused the indignation of all. Her husband and her brother left home about two o'clock in the afternoon on Friday, the 23rd day of April, 1915, to go to her father's place, some twelve or thirteen miles away, for the purpose

of assisting him in his farm work, to remain absent until Sunday, the 25th. Before leaving home the husband had his wife promise also to leave the house not later than five o'clock in the afternoon for the purpose of spending the night at the home of a near neighbor; and this because it was regarded as unsafe for her to remain alone at home. Upon Saturday afternoon, the 24th, between five and six o'clock, Wilson's father and a friend came to Wilson's house for supper. Finding that nobody responded to their greetings, and then finding a door open, they went into one of the rooms of the house and found Mrs. Wilson dead upon the floor. She had been gagged with a red bandana handkerchief, her union suit and some other parts of her clothing tied around her head and face, and her arms were tied to the bed post. She was almost nude. She had been mortally shot in the left side, apparently while prone upon the floor, and their conclusion was that she had been ravished. At the inquest on Sunday, the accused, James Canter, was arrested and charged with the crime. He protested his innocence, and on the same day his brother, Luther Canter, who had been a fugitive from justice for several months charged with rape, confessed, first to his mother and then to Mr. S. P. Legard, who was supervisor of the district, in the presence of his brother, W. J. Legard, that he, Luther, was the murderer and ravisher of Mrs. Wilson, and that his brother James knew nothing about it and had nothing to do with it. Upon this confession Luther Canter was convicted and has been electrocuted therefor.

The main facts relied upon to convict James Canter of the crime are:

(1) That he had no two occasions, in lewd conversation, indicated his lecherous disposition and lustful desires towards Mrs. Wilson—once to a woman with whom he was drinking out of a bottle along the road, and again with his

boyish companions. The statement was made to the woman nine months before the murder, and her evidence, as shown in the two records before this court, varied to this extent: In the first record it is, "I wish I could have Mrs. Wilson; I would rather see her dead than living with Ruf. Wilson." Upon the last trial it was, "He said that he loved Mrs. Wilson and had tried to get her to go away with him, and she would not go, and he would kill her before she would (should) stay with Mr. Wilson, but he was drinking." Another witness, Mary Foust Worley, testified that a short while before the murder he had said, "that Mr. Wilson was mad at him, and that his wife was not, and that he had not quit speaking to Mr. Wilson, and he said that he loved Mrs. Wilson, many times, but I thought he was just joking. I never thought anything about any trouble. I seen Jim and her in the berry field one time when we went in there, but I seen no harm between them. He always said she was nice."

The accused had worked as a farm hand with Mr. Wilson for nearly a year, and during that time was intimate and friendly with the family—so intimate that Mrs. Wilson frequently read good books to him, and he stayed at the house one night with Mrs. Wilson's small brother, evidently as her protector. This friendly relationship, however, had been severed about two months before the murder, and the accused, Canter, had been discharged by Wilson for inefficiency, chiefly because he wanted to quit work too early in the afternoon.

(2) That a red bandana handkerchief, apparently identical with that with which Mrs. Wilson was gagged by her murderer, was found in the pocket of some overalls which belonged to the prisoner. There were no peculiar marks about either of these handkerchiefs and no one testified that he ever bought two such handkerchiefs. The prisoner himself stated that he had bought several handkerchiefs,

red and white, from Hilton, a merchant in the neighborhood, but that he had only bought two red handkerchiefs from him, and one of them was found in his own pocket, which he said had been torn to bind up his bleeding finger, and the other was the one found in his overalls pocket. All that Hilton could say about it was, that the handkerchief with which Mrs. Wilson was gagged and that found in the overalls pocket were similar in pattern to handkerchiefs which had been sold at his store, and that he had only one kind of red bandana handkerchiefs for sale.

(3) The overalls to which James Canter directed the officers were hanging up in his room at his home, and upon the back part of one leg blood stains were found. These blood stains were analyzed by an expert and he expressed the opinion that the blood on the overalls was either human blood or the blood of some animal having similar blood. The prisoner did not undertake to account for these blood stains, but said he did not know from what source they came. Upon repeated examinations from time to time in response to questions, he suggested that they might have come from a bleeding finger; that he had helped Mr. Wilson to kill hogs once; that his nose sometimes would bleed and that he might have gotten his hands in it; and that he sometimes wrung the necks of chickens for his mother. He declined, however, to state or undertake to state the source of this blood.

(4) Cuddy, deputy sheriff, testified that when the accused was brought to jail and placed in an upper cell, from which he could see Luther Canter when he was later brought there and put in a lower cell, he (Cuddy) heard them talking in loud tones to each other, one being upstairs and one downstairs, and that Jim said to Luther, "You didn't give up," and Luther said, "I did;" and Jim said, "You didn't confess, did you," and Luther said, "I did;" then Jim said, "You didn't say anything about the trouble

down there," and Luther said, "I did," and then Jim said, "You've played hell;" that he (Cuddy) did not know what they were talking about. When it is remembered that Luther Canter had been evading arrest for another crime for many months, it is at least equally probable that the inquiries of the accused referred to that other crime as to Mrs. Wilson's murder. That James Canter should in a loud conversation, under these circumstances, implicate himself is inconsistent with anything he ever said or did at any other time or place.

It also appears that on the day before the crime was committed Luther Canter was in hiding near the Canter house; that he came out to the place in the Legard "newground" where his father and others were working; that the accused brought dinner to them. It is also shown that when Wilson and his wife's brother left home on Friday afternoon they could have been plainly seen by persons at the Canter house and the "newground" for a considerable distance as they traveled along the road on their journey.

On the other hand, the facts relied upon to show his innocence are these:

It was proved by the Commonwealth's witnesses as well as by the prisoner's witnesses, that James Canter was in the city of Bristol in the early afternoon of Friday, March 23rd; that in company with certain boys, apparently of his own age, he rode on a freight train from Bristol, about three or three and a half miles, towards his own home, and jumped from the train there at about four or half past four o'clock; that he went across the field, not in the direction of the Wilson house but towards his own home. It sufficiently appears that when nearly home he caught up with his mother, carrying a bucket of water, and that a few minutes thereafter he went out to the Legard "newground," in a different direction from the Wilson house, where his father and several others were at work; that he

stayed with them until they quit work, at about 5:30 o'clock, and then went to his home nearby to supper.

It is manifest that Mrs. Wilson was attacked and either imprisoned or killed at her home at some time between two o'clock, when her husband left, and six o'clock that afternoon. This is clear for the Commonwealth's testimony shows that Mrs. Wilson promised her husband not to remain at home later than five o'clock; so that during the period in which Mrs. Wilson must have been attacked, the prisoner's movements are fully accounted for—during most of the time by the Commonwealth's witnesses, and during the entire time by unimpeached and disinterested witnesses.

Again, it is clearly proved that during this afternoon as well as on the next day the prisoner was wearing a pair of brown corduroy pants, and no witness is produced who testifies that James Canter had on the overalls at any time during the period from Friday, the 23rd, to the inquest, Sunday, the 25th.

The theory of the prisoner's counsel is that Mrs. Wilson was shot about four o'clock on Friday afternoon, and he introduced two witnesses, Carmack, who was working in a field nearby, and Moore, who was hauling extract wood to the Legard siding, who testified that they heard what they thought to be a gun shot, in the direction of the Wilson house at about that hour. Others in the vicinity testified that they did not hear such shot. The theory of the Commonwealth, however, is that Mrs. Wilson was not murdered in the afternoon, but was kept helpless and bound until about 4:20 A. M., Saturday, the 24th. To sustain this theory they introduced the witnesses, Hensley and his wife, who testified that they were milking their cows at that hour and heard in the direction of the Wilson house what they thought was a gun shot. Wilson had a gun in the room in which the murder was committed, and the empty cartridge from this gun was found in the room, and the gun itself

was found on Sunday, concealed, covered with leaves, by the side of a fence in a hollow between the Wilson and the Canter house, but not in sight of the Canter house, and it appears that the shot which killed Mrs. Wilson was fired from this gun.

After the confession of Luther Canter, and because his captor, Legard, disbelieved it, he was asked where he had concealed the gun, and when he went towards the place where it was found, having until just before that time, so far as the testimony shows, been in hiding and not at the Canter house, Mr. Legard was satisfied, and as he expresses it had no doubt of his (Luther's) guilt.

This appears to be all of the pertinent testimony in the case. Several physicians testified that they thought, but were by no means certain, that the woman was not shot as early as four o'clock on Friday. The wound in the body showed the powder marks, and from this the witnesses properly inferred that the gun was held close to the body at the time it was fired, and taking the position of the body as they found it and the course of the shot, they were certain that the person who fired the gun stood at the time very close, probably within one foot of the body, and from this it was inferred that the blood spouted out upon the overalls. That this is an inference from facts which are not known is perfectly apparent, because it is not known in what position the body was at the time the shot was fired. Luther Canter, the only person who claimed to know, said, however, that he stood about eight feet away. There is much testimony tending to discredit Luther Canter's statement that he committed the crime alone, based upon the fact that he was a frail, weak man, while Mrs. Wilson was twenty years of age, a stout, strong, robust woman.

In order to connect James Canter with the murder, in accordance with the theory of the Commonwealth, we must assume that at some time after eating his supper on the

101

evening of Friday, the 23rd, and after he had gone to bed (according to the testimony of those in the house) he got up in the night, put on his overalls and went down to the Wilson house and there murdered or assisted in the murder of Mrs. Wilson, when there is no sufficient evidence to support such a theory. That it was possible is no doubt true, but men should not be convicted of crime merely because they are suspected of it and there is a possibility of guilt. In this case the jury were properly instructed, that unless the circumstances proved are of such a character and tendency as to produce upon a fair and unprejudiced mind a moral conviction or conclusion of the guilt of the accused, it was their duty to acquit; and that in order to convict a person upon circumstantial evidence, it is essential that the circumstances should to a moral certainty exclude every reasonable hypothesis except that of guilt. It is a mere suspicion that the handkerchief with which Mrs. Wilson was gagged was ever in the possession of James Canter. It is a certainty from the evidence that at the time Mrs. Wilson was attacked in the afternoon of Friday, the 23rd, James Canter did not have on the overalls; and it is a certainty from this evidence that from the early afternoon until six o'clock, during which the assault must have been first made, James Canter was not at the Wilson house at any time, and his alibi from six o'clock on Friday night until seven o'clock on Saturday morning, is proved by the members of his family, who, however, are said by many witnesses to be unworthy of belief. His action on Saturday, the 24th, is not that of a guilty man, for early on that morning he left his home on foot, going the usual way to Bristol in the direction of the Wilson house, and unless he abruptly left the road or path he passed immediately by the Wilson house to the public road. That he would have gone so near the scene of his crime, if guilty, seems incredible. He spent Saturday and Saturday night at his sister's

in Bristol, and having heard, along with the rest of the community, of the tragedy, on Sunday morning he went, in company with others, to the Wilson house. He has made no incredible or contradictory statements upon any material point.

It is noteworthy that the Commonwealth undertook to destroy the alibi of the prisoner on Friday night, during which he says he stayed at home all night long, by the testimony of the witnesses, Campbell and Logan, who on Sunday morning were coming with him down to the Wilson house where the crowds were gathering; and they say that he then told them that on Friday night, as he came from town, he was attacked by two men on the railroad track. The prisoner denied this, and said that he told them he had been attacked some time before by men at that place. The prisoner is strikingly corroborated as to this occurrence by Rufus Wilson, the husband of the deceased, who testified for the Commonwealth that two or three months before he discharged him, Canter came in his house one evening and told the same story, and showed scratches on his face and a torn place in his coat. The Commonwealth also attaches significance to the testimony of these witnesses as to the prisoner's conversation during the same walk to the Wilson house, especially what he said about the gun and how the crime was committed; but it must be remembered that he was perfectly familiar with the interior of the Wilson home, and as to the other matters discussed his knowledge was no greater than the public knowledge. At that time, it appears from the record, everybody was talking about the murder and its details, which had been discovered on the evening before, and they were all on their way to attend the inquest.

This was said in *Burton & Conquest* v. *Commonwealth,* 108 Va. 898: "In order to justify a conviction, juries are told that every fact necessary to a verdict of guilty must

be proved beyond a reasonable doubt; and that, if there be a reasonable doubt as to any fact, they shall acquit; that the result of the evidence must be to exclude every reasonable hypothesis of innocence and be consistent only with the guilt of the accused. Now it is true that after the jury have rendered their verdict and a court is called upon to set it aside as being contrary to the evidence, the motion is heard, under our statute, as upon a demurrer to evidence, and it becomes the duty of the court to consider whether or not the evidence is sufficient to sustain the verdict. But the rule does not leave the jury at liberty to guess, and where a fact is equally susceptible of two interpretations, one of which is consistent with the innocence of the accused, they cannot arbitrarily adopt that interpretation which incriminates him." *Grayson's Case,* 6 Gratt. (47 Va.) 712; *Grayson's Case,* 7 Gratt. (48 Va.) 613; *Prior's Case,* 27 Gratt. (68 Va.) 1009; 8 R. C. L., sec. 222; note, 97 Am. St. Rep. 778.

One charged with crime is presumed to be innocent, and that presumption follows him throughout every stage of the trial. The burden of showing the guilt of the prisoner to the exclusion of every reasonable doubt is upon the Commonwealth, and this burden never shifts and always rests upon the prosecution. While the Commonwealth may prove such facts as may raise the presumption of guilt unless they are rebutted by the accused, still after the evidence is closed, if upon a consideration of the whole there is a reasonable doubt of his guilt, the jury should acquit. *Potts* v. *Commonwealth,* 113 Va. 733; *State* v. *Wingo,* 66 Mo. 181, 27 Am. Rep. 329.

In this case the facts adduced by the prosecution to convict the accused, considered collectively as they must be when circumstantial evidence is relied on, are just as consistent with his innocence as with his guilt, and when this is true, that interpretation which acquits him must be

adopted, for it is fundamental that if there be a reasonable doubt of his guilt there can be no conviction. After six trials the Commonwealth has failed to produce evidence sufficient to sustain a conviction. Suspicion cannot be substituted for proof, and upon this evidence the accused is entitled to an acquittal.

The evidence being insufficient to warrant the verdict of guilty, the judgment of the trial court refusing to set it aside must be reversed, and the case remanded, to be disposed of according to law.

*Reversed.*