# Richmond.

## THOMAS NELSON v. COMMONWEALTH OF VIRGINIA.

November 14, 1929.

The opinion states the case.

*McCue & McCue,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorneys-General,* for the Commonwealth.

CHICHESTER, J., delivered the opinion of the court.

The accused, Thomas Nelson, was tried February 6, 1928, in the Circuit Court of Albemarle county for the murder of J. H. Allen, an elderly merchant of that county who was killed in his store at Nick's Post Office on the night of August 5, 1927. About the same time, Mrs. Willie Rothwell, his business partner, was struck over the head at their home about 100 yards from the store and died of the injuries a short time thereafter. The homicide was discovered about nine o'clock the night of the 5th. Bloodhounds were put upon the trail leading from the body of the deceased and followed the trail directly to the home of one Templeton, in the opposite direction from the home of the accused.

The accused, a negro, was at the scene of the homicide the next morning when a large crowd gathered there. He was arrested on August 23rd and was later, upon his trial, found guilty by the jury and his punishment was fixed at imprisonment for life. Upon this verdict the court entered judgment.

There were a number of exceptions taken during the Nelson trial and a number of assignments of error, but the only assignments relied on by the accused in his petition for a writ of error were:

(1) The court erred in allowing the Commonwealth's attorney in his closing argument to make the following statement over defendant's objection, that

"But, I do think in justice to the sheriff of this county and the deputy sheriff, who have constantly been put upon the stand in lieu of the defendant."

(2) The court erred in refusing defendant's motion to set aside the verdict as contrary to the law and the evidence, and without evidence to support it.

■ There is nothing to be gained by a discussion of the first assignment of error as we are clearly of opinion that the evidence is not sufficient to support the verdict of guilty.

2. The crime was a shocking one and as is to be expected in such cases it naturally aroused great indignation in the community where it occurred, but there was no direct evidence of the participation of the accused in the crime, nor were there sufficient circumstances to connect the accused with, or to single him out beyond a reasonable doubt as, the perpetrator thereof. There are some suspicious circumstances which point in his direction, but there were suspicious circumstances which pointed to others, Earl Nightengale for instance, whose testimony will be referred to later, who was arrested and charged with the crime and kept in jail nearly a month.

The evident purpose of the homicide was robbery, as there were several trunks in the dwelling house emptied of their contents, but there was also a considerable sum of money found in the dwelling house and in the store, but nothing was found on the premises or person of the accused to suggest that he had rifled the house occupied by the old people.

The only witness who testified that he saw the accused at the scene of the crime on the evening the homicide was alleged to have been committed was Earl Nightengale, above referred to, a negro boy sixteen years of age. This boy was charged with the

same crime. He was arrested forty-three days after the homicide and had a preliminary hearing before a justice of the peace. He denied all knowledge of the crime and after being in jail twenty-three days he said for the first time that he had seen the accused near Allen's store on the night of the homicide, but Nightengale was there also in his car and he testified that he carried a stranger there with him. Witnesses both for the Commonwealth and the defendant testified without contradiction that on Tuesday, August 2nd, an unidentified stranger alighted from the southbound Southern express at Charlottesville, hired a taxi from one, V. E. Grose, and at his request was driven directly from Charlottesville to the home of Grant Thompson, father-in-law of the accused, with whom Nelson, his wife and four small children lived.

The accused was not there when the stranger arrived at the home of his father-in-law. He was in Charlottesville at that time but returned there a little later and the stranger went with him. Both came back to the home of Grant Thompson and spent the night, but left the next morning before the wife of the accused got up. Later the accused drove this stranger out to Blue Ridge Sanitorium where he said he was looking for work. The Commonwealth in its brief stresses the fact that there is no evidence as to the whereabouts of the accused or the stranger after three o'clock until the morning of the murder, but Bessie Nelson, the wife of the accused, testified to a trip taken by the accused, herself and two of their children to Charlottesville to a circus. There is some conflict in the evidence between Bessie Nelson, the wife, on the one side and one or two witnesses on the other as to her husband's whereabouts in Charlottesville or on the road at certain hours which are not definitely designated.

It is clear that so far as the evidence to this point is concerned there is nothing except the association of the accused with the stranger that is in the least suspicious, but there is little or no evidence against the accused. The only evidence that points to Nelson as the perpetrator of the crime is—

1. That Nelson drove on the morning after the homicide to where a colored man, Jas. Lincoln, was working and asked him to say that he, Lincoln, had sent a strange man out to Nelson's house. This Lincoln agreed to do, but later when asked about it in the presence of the sheriff, Lincoln refused to go further with the story and told the sheriff that he had not sent a stranger to Nelson's.

2. Earl Nightengale, heretofore referred to, testified that he saw the accused near Allen's store on the night of the homicide; his identification of Nelson was positive. His testimony upon this point was as follows:

"Q. Where did he go while you were standing outside the store, sitting in the car?

"A. Right at the left, back of the store.

"Q. And passed by as close as that wall?

"A. Yes, sir.

"Q. And you did not speak to him?

"A. He did not pass by me; he turned just before he got to the car."

Nightengale and Nelson had a talk in front of the Charlottesville police station while the murder investigation was going on. He was asked—

"Q. What was said, if anything, down there between you?

"A. He asked me—I told him about the strange man. He asked me did I know him. I said: No. He asked me what had I told the people. What had I

told about the strange man. He said: 'Don't tell that; don't tell no more, you will get me in trouble."

3.    Another witness, Sam Dudley, said he saw someone near Allen's store about eight o'clock and while he could not identify Nelson as the man, said it looked right much like him.

4.    John Burton testified that about dusk he saw a bright skinned man between William Porter's gate and the forks of the road, about 125 or 150 yards from the Rothwell house, but he thought this man was heavier than Nelson.

5.    A number of alleged inconsistencies and contradictions are discussed by the Commonwealth in its brief on the part of Bessie Nelson, wife of the accused, in an alleged effort to establish an *alibi* for the accused. While there were some contradictions of the witnesses' testimony in this connection, they are not sufficient to establish the guilt of the accused, and at most create only slight suspicion, nor are they sufficient when taken in consideration with all the other evidence to establish his guilt beyond a reasonable doubt.

6.    There was evidence to the effect that a pair of overalls with bloodstains on them were found the morning after the murder on the wire fence alongside the road between Nelson's home and Allen's store, but there was no evidence to connect the accused with these overalls. .

The foregoing, we think, is a fair resume of all the evidence in the case which has a tendency to connect the accused with the crime. At most it constitutes a disconnected story, parts of which are sufficient to raise suspicion of the guilt of the accused, but taken as a whole it is not sufficient to prove beyond a reasonable doubt that Nelson was the perpetrator of the crime. The evidence points equally as strongly to any one of

several other persons as it does to the accused, as the evidence hereinbefore referred to demonstrates.

■ In *Cox* v. *Commonwealth*, 140 Va. 513, at page 517, 125 S. E. 139, this court, speaking through Judge Burks, said: "To convict of a crime, the jury must be satisfied from the evidence of the guilt of the accused beyond a reasonable doubt, and they cannot be so satisfied if the evidence is equally consistent with his guilt or innocence. Mere suspicion, however grave, is not sufficient to support a verdict of guilty. The evidence must be not only consistent with the guilt of the accused, but inconsistent with his innocence. Citing *Hairston* v. *Commonwealth*, 97 Va. 759, 32 S. E. 797; *Davis* v. *Commonwealth*, 99 Va. 838, 38 S. E. 191; *Burton & Conquest* v. *Commonwealth*, 108 Va. 892, 62 S. E. 376; *Wooden* v. *Commonwealth*, 117 Va. 930, 86 S. E. 305, Ann. Cas. 1917D, 1032; *Canter* v. *Commonwealth*, 123 Va. 794, 96 S. E. 284.

The record fails to point out the perpetrator of the crime with that clearness and certainty required by law. Can anyone say after reading the evidence, as adduced at the trial, who committed the homicide? Surely we get nothing tangible or convincing from either the record or the Commonwealth's brief upon which to convict the defendant of murder and to prove beyond a reasonable doubt that he, to the exclusion of everyone else, committed or participated in the crime.

The judgment of the Circuit Court is clearly erroneous and should be reversed and remanded for a new trial, if the Commonwealth is so advised.

*Reversed and remanded.*