# 𝕾𝖙𝖆𝖚𝖓𝖙𝖔𝖓

## Ralph H. Garner v. Commonwealth of Virginia.

September 3, 1947.

Record No. 3181.

Present, Hudgins, Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*T. W. Messick, Charles A. Hammer, Jr.,* and *Glenn W. Ruebush,* for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *M. Ray Doubles* and *Walter E. Rogers, Assistant Attorneys General,* for the Commonwealth.

GREGORY, J., delivered the opinion of the court.

The accused has been convicted of murder in the second degree, and sentenced to confinement in the penitentiary for a term of twenty years, pursuant to the verdict of a jury. The case is now before us for review.

At the February term, 1945, the grand jury of Rockingham county indicted the accused jointly with Grace M. Smith for the murder of Frank C. Smith on February 20, 1945. They plead not guilty. On June 29, 1945, Grace M. Smith moved for a severance and the court ordered that she be tried separately. Her trial began on October 15, 1945, and lasted for seven days. It culminated in a verdict of the jury convicting her of murder in the first degree and fixing her punishment at twenty years in the penitentiary, upon which the court entered judgment accordingly. On February 1, 1946, a writ of error to this judgment was granted, but before the case had been decided by our court Ralph H. Garner, the other accused, was put upon trial on April 15, 1946, continuing nine days. He was convicted of murder in the second degree and his punishment fixed at a period of twenty years in the penitentiary.

The Smith case was argued before this court at the October term, 1946, and an opinion was handed down on November 25, 1946, in which the judgment against her was reversed for the reasons therein stated. See *Smith* v. *Commonwealth*, 185 Va. 800, 40 S. E. (2d) 273.

The indictment charged that Grace M. Smith and Ralph H. Garner "on or about the 20th day of February, 1945, in said county, unlawfully and feloniously did kill and murder one Frank C. Smith * * *". A bill of particulars was requested in which it was stated that the Commonwealth "charges and expects to prove that on the 20th day of February, 1945, between the hours of 6:00 o'clock p. m. and 10:00 o'clock p. m. of that day, at No. 60 Willow street, in the city of Harrisonburg, in the county of Rockingham, Virginia, the said Grace M. Smith and the said Ralph H. Garner, being each and both then and there present, and each acting in concert with the other, and each

aiding and abetting, counselling, advising, assisting and encouraging the other, the felony and murder to commit, and do, feloniously, wilfully, deliberately, and premeditatedly did strike, beat and wound the said Frank C. Smith with their fists and with a hammer and with some blunt instrument, the exact kind and description of which is to the Commonwealth unknown, then and there mortally wounding the said Frank C. Smith in and about the head, face, chest, veins, arteries, brain, viscera and body of the said Frank C. Smith, and did then and there on the day and year aforesaid, in the county aforesaid, and at the address in the city of Harrisonburg aforesaid, by means of a rope then and there by said Grace M. Smith and said Ralph H. Garner tied about the neck of the said Frank C. Smith, did strangle, asphyxiate and hang the said Frank C. Smith * * *", from which said wounds and strangulation he died.

It is noted that Mrs. Smith was found guilty by the jury of murder in the first degree and given the minimum punishment of twenty years in the penitentiary, while Garner has been found guilty of murder in the second degree and given the maximum of twenty years in the penitentiary. Both verdicts were evidently compromise ones.

The record discloses that Garner was tried in an atmosphere hostile to him; that he was tried by a jury, some of whom were not open minded (at least one said he had formed and expressed an opinion that Smith had been murdered), and other irregular incidents of the trial are pointed out. However, in the light of our ultimate conclusions these defects are not important.

Frank and Grace Smith were married approximately eighteen years. He was thirty-eight years of age at the time of his death and she was thirty-four. They were both gainfully employed. He was an automobile mechanic and she a stenographer. In addition to her stenographic work she did her household work and was an excellent housekeeper.

Smith was a large man weighing some 208 pounds. He was nearly a perfect physical specimen. She weighed be-

tween 115 and 120 pounds. They had enjoyed a peaceful and happy married life. On January 20, 1944, he was inducted into the army where he remained until December 29, 1944. They corresponded regularly. Soon after he returned from the army trouble began to arise between them. He seemed to be suspicious of her, accused her of unfaithfulness, appeared worried and troubled and was unable to sleep at night. He consulted his physician about his condition. The doctor testified that Smith was definitely depressed and laboring under strain and under terrible and turbulent emotions. He was advised to refrain from drinking. He last saw his doctor on the day of his death.

On the day of the tragedy Mrs. Smith worked as usual at an insurance office where she was employed, until closing time, approximately 4:30 p. m. Marion Towns was employed in the same office and she and Mrs. Smith left the office together. They were to have dinner at Mrs. Smith's home. On the way home they went to an A.B.C. store and purchased two bottles of gin and carried it to the Smith home.

Frank C. Smith worked at his trade until quitting time which was around 6:00 p.m. Marion Towns and Grace Smith prepared and ate dinner. Smith also ate with them. Around 7:30 that night one Douglas Leach came to the Smith home pursuant to his engagement with Marion Towns. He and Marion Towns left the Smith home at approximately 9:00 p.m. They all walked out of the front door together except Frank Smith. They seemed to be in a jovial mood and were laughing and talking. Leach and Marion Towns drove away. A few minutes after nine o'clock a minister who lived across the street from the Smith home drove his car, as was his custom, into the driveway of the Smith home and then proceeded to back directly across the street into his own driveway.

The Smiths occupied separate bedrooms. They were connected by a small hallway approximately 30 inches wide and seven feet long. The bath room was between the two bedrooms.

That night, in response to a call for help by Mrs. Smith, the police officers arrived almost immediately. They fixed the time of their arival at 9:40. When they were greeted by Mrs. Smith she was not very cooperative, had been crying, and seemed to be emotionally upset. She finally showed them the blood in the hallway, and later directed them to the basement where they found the body of Frank Smith suspended by a rope around his neck. It was tied to the braces in between the joists and the body was partially supported by the rope around his neck and partially by a stool or kitchen step-ladder, upon which he was sitting. The rope was not tied in a slip knot and was loose. The coroner said he could place three fingers under it.

The officers called Dr. Byers, the coroner of the county, and he arrived in a few minutes. He had had wide experience in holding inquests. He made a careful examination of the body and the surrounding conditions upon the completion of which he cut the rope and with the assistance of the officers lowered the body. He reported that Smith's death was due to strangulation from hanging and that he had been dead approximately 40 to 50 minutes. This fixed the time of death at about 9:30 p. m. on the night of February 20, 1945.

An examination of Smith's head revealed a small wound on his forehead above the right eye and below the hair line. An artery had been cut from which he bled profusely. The blood came down the right side of his face over his mouth, over the front of his undershirt and down to his crotch. His undershirt and shorts were otherwise fresh and clean. The coroner testified that the wound on his head was caused by a blow from a small hammer which was found lying in or near two pools of blood in the hallway. The head of the hammer could have been fitted into the wound. Smith's face bore one or two superficial scratches and excoriations. The rope had made a mark around his neck from the back of one ear to the back of the other, running around the front. The knot was tied in the back.

The coroner made a careful examination of the pools of blood in the hallway, and he conversed with Mrs. Smith. Her answers to his questions were not entirely satisfactory. For instance he asked her what had happened, to which she replied that she had gone to bed, and when he informed her that her husband was dead she said, "Well, that can't be." She inquired how long it had been, and he replied, "Forty or fifty minutes," to which she again repeated, "Well, that can't .be." He stated, "I am only going by your time," and she answered, "Are you trying to get smart with me?", to which he replied that he was not. Dr. Byers also testified that she was crying and demonstrating grief. She told him she knew nothing of the two pools of blood until she went to the bath room and stepped in them.

The coroner, not being satisfied about the cause of death, had the body transported to the hospital for further examination. He X-rayed the head and neck and found that there was no evidence of a fracture and that the blow on the head did not cause any concussion or unconsciousness. The neck was not broken. There was no other wound on the body that would have caused death. The cut had severed an artery and caused the blood to flow. The coroner's conclusion, after his examination at the hospital, was that Frank Smith had committed suicide. From this conclusion he has never retreated and even after the body had been examined some thirty days later at the hospital in Charlottesville by an eminent pathologist and he had had the benefit of the pathologist's report he still was of the opinion that Frank Smith committed suicide. His language is: "I think I stated before that it was my personal opinion from the facts that I found, that he did not have a fractured skull, that he did not have a broken neck, that death was caused. by strangulation, and as a personal opinion, was the result of suicide. I did state that and I am still of the same opinion."

On the 28th of March, 1945, Smith's body was exhumed and taken to the University of Virginia hospital where it

was examined by Dr. Cash. He reported that Smith had died from strangulation by hanging. He would venture no opinion as to whether it was a homicide or suicide.

Counsel for the accused suggests in an attempt to account for the tragedy that Smith struck himself in the forehead with a hammer; severed an artery that bled profusely; stood in the hallway of his home bleeding for approximately ten minutes; walked into the bath room, obtained therefrom a wash cloth and placed it over the cut in his forehead, then walked out of the bath room, with the wash cloth held over the cut, into the kitchen and thence down the cellar steps to the basement where he hanged himself. This theory or suggestion of counsel has not been satisfactorily proven, but that burden was not upon the accused.

There are many circumstances consistent with the innocence of the accused. We will relate some of them. When the officers arrived the Smith home was in good order and condition except for the blood in the hallway. The furniture was in its usual position and none of it was broken. It did not show any indication that it had been moved. There were no marks, signs or other indications of any struggle between two or more persons, or that a fight had taken place. From the size of the blood spots in the hallway the doctor testified that eight or ten minutes would have been required for him to have bled that much, and that he was standing while he was bleeding. That Smith was standing in the hallway while bleeding was established by the fact that when the blood dropped from the wound in his head and struck the floor it spattered along the baseboard and side of the hall where he was standing to a height of some 12 to 15 inches and spattered and specked his legs for the same approximate height, and if he had not been standing but had been knocked to the floor the blood would not have spattered as it did. The was blood on the bottom and top of the bedroom shoes that he wore, and there were footprints in the blood spots indicating that he had stepped in it. No blood was found on Smith's body other than the

blood spots or specks on his legs and the streak of blood on the front of his undershirt running down to his crotch. All of the blood was shown to have come from the wound above the eye. The streak extending the length of his shirt was some two or three inches wide but his body was otherwise free from blood.

The two pools of blood in the hallway were not smeared and there was no indication that he had fallen or that he had a fight or a struggle. There was no evidence of any marks or any other indication that any effort had been made by anyone to clean up the blood or to conceal any evidence as to what had occurred. There were drops of blood leading from the hallway into the bath room for a distance of approximately 32 inches. Mrs. Smith had stepped in the blood. Her bedroom shoes had blood on the soles and her tracks were in the pools of blood.

In order for Smith to have reached the basement either walking or being carried he necessarily would have had to pass through the kitchen and down the steps to the basement. There were various pieces of furniture in the kitchen which were not disturbed. There were no blood spots in the kitchen, but there was a foot print of a slipper of Mrs. Smith which she evidently wore when she stepped in the blood in the hall. The first three or four steps leading from the kitchen to the basement had no blood spots on them. On the lower steps there were one or two drops of blood which were not smeared. A bath room wash cloth which came from the bath room, partially saturated with blood, was found by the officers on the table in the basement a few feet from the body. There was blood on Smith's right hand. There was blood on the step-ladder and on the floor underneath where Smith was found hanging. It was shown that blood does not flow from a dead body. His body was free from any marks indicating a struggle or a fight of such force as might have knocked him out or caused his death. There was no evidence that Smith had been dragged, pushed, shoved or carried from the hallway to the basement.

The clothing of Grace Smith was free from blood except the bottom of her shoes where she had stepped in the blood in the hall. There is no evidence that she attempted to remove any blood stains or to clean up any part of the house after Smith's death. Some of the blood appeared along the side of the walls of the hallway and on the glass transom above the doorway that led into Mrs. Smith's bedroom; specks of blood were found in her bedroom, on the bed clothing and near the head of her bed. The hammer that was found at or near the blood spots and which the accused claims caused the wound in Smith's head belonged to Smith and it was usually kept in the drawer in the kitchen.

On the other hand, for the Commonwealth it was shown that Garner was a large man 6 feet 5 inches tall and weighing between 250 and 260 pounds; that he had been seen with Grace Smith and had been seen on the Smith premises; that he had written her first name, "Grace," in the front of his telephone book, together with her home and office telephone numbers; and that he had referred to her as a friend. When he was first arrested he told the police officers that he would not be able to establish an alibi because he was a bachelor and lived alone. He offered an alibi at the trial, imperfect though it was.

He usually wore a ring which the Commonwealth claimed was capable of inflicting the type of wound which the deceased received on the side of his head, and on the morning after the tragedy there is testimony that he bore bruises on his face and across his ring finger, and finally a Mrs. Rhodes testified that she saw Garner drive on the Smith premises at approximately nine p.m. and saw him leave at approximately 9:30 p.m. It was between that time that Smith met his death. Dr. Cash, a witness for the Commonwealth, testified that he did not think the ring caused the wound. The coroner said it was caused by the hammer. There is no other evidence on that point.

The testimony of Mrs. Rhodes, which is the only testimony that places Garner at the Smith home at the time

of the tragedy, was severely challenged by the accused. Mrs. Rhodes testified that at approximately nine o'clock or a few minutes thereafter she was riding in a car driven by her husband and they approached and passed a car in which she identified Garner as the driver. She testified that she watched the car and it turned into the Smith driveway. She said that she could identify him because there was a street light 81 feet away that afforded sufficient light. She further testified that after he drove into the Smith driveway that she got out of her car and stood in front of her house for some 20 or 30 minutes and that while getting out of her car she heard a scream from a man's voice and that it was followed by a "lumbering noise, something like a door or something fell," but that she did not report it to her husband. She also testified that she saw this car back from the Smith driveway and it proceeded by her house; that she again identified Garner as the driver, that he was looking back in the direction of the Smith house as he drove; that he was dressed in a dark suit of clothes and wore a hat turned up but that he did not wear glasses.

Counsel for the accused conducted tests to ascertain whether a person passing another in an automobile at nine o'clock at night at this particular place could be identified. They also conducted tests to ascertain whether a person standing on the ground where Mrs. Rhodes claimed to be standing when she said Garner left the Smith home in his car could have identified him. The conditions at the time of the tests were substantially the same as those existing the night of the tragedy. There were nine witnesses who were engaged in the tests. Not one of them was able to identify anyone in a car under the circumstances detailed by Mrs. Rhodes. They said that it was impossible to ascertain whether the driver of such a car was a man or a woman or black or white. This testimony of these nine witnesses completely refutes the testimony of Mrs. Rhodes and renders it incredible and unworthy of belief.

The officers of the Commonwealth knew that the tests

were being conducted. They knew that the evidence of them would be introduced, yet they presented no witnesses to contradict the witnesses introduced for the accused on this point. They did not seek to bolster or support the testimony of Mrs. Rhodes even though it had been practically destroyed by the evidence of the tests. From this it is fair to conclude that their failure in this respect was due to the fact that they knew if they had made tests the result would not have supported the testimony of Mrs. Rhodes but would have confirmed the evidence of the tests made by the accused showing that her testimony was incredible.

We have restated the elementary principle many times that this court is not required to believe that which is contrary to human experience and which we know to be incredible. We are not compelled to accept as true what in the nature of things could not have occurred in the manner and under the circumstances narrated. Citation of authority is not necessary for this familiar principle.

Without the testimony of Mrs. Rhodes the record is silent as to who had an opportunity to kill Smith other than Mrs. Smith, and she has now been cleared of the charge. It is silent as to who struck him or how he got to the basement. If he walked to the basement no doubt he would have left tracks. There is no evidence of tracks, and none that any tracks were wiped up. If he was carried to the basement there is no evidence of it. No one testified whether someone struck him with the hammer or whether he struck himself, but we do know that the hammer caused the wound. The unqualified testimony of the coroner, a witness for the Commonwealth, shows this. Dr. Cash, the pathologist, said that it was not likely that the wound was caused from the ring. No one has said that he was not struck with the hammer.

The burden rested upon the Commonwealth to show how and under what circumstances Smith met his death. This it has failed to do. It has failed to show or explain how Smith reached the basement. If he were murdered it

has failed to show who committed the crime or where it took place—whether in the hall or in the basement. If he were subdued after an altercation in the hall there was no evidence of a struggle. That an altercation took place in the hall is purely guess.

In the *Smith Case*, at page 818, we said:

"It is not necessary to detail the evidence again. It is enough to say that the evidence is not sufficient to establish that there was a fight in which deceased was subdued before the open door of the defendant's bedroom and on her bed; it is not proved that the blow on the head of the deceased knocked him unconscious. The evidence shows that the deceased did not fall to the floor in the hallway. It does not furnish ground for a valid inference that the assailant and this defendant picked up the body of deceased intending to carry it to the basement and string it up. It entirely fails to show that any blood tracks on the floor of the dining room and kitchen were cleaned up, and other evidence of a fight removed."

We now may add to that statement, which is clearly applicable here, that Garner has not been shown, by credible evidence, to have been at the scene of the tragedy when it occurred.

The burden rested upon the Commonwealth to prove beyond a reasonable doubt the criminal agent responsible for the crime. No burden rested upon the accused. He stood upon the legal presumption of innocence which went with him throughout the trial.

The Commonwealth has relied upon many unexplained suspicious circumstances to sustain the conviction but not one of them, or all combined, is or are, sufficient to show the guilt of Garner beyond a reasonable doubt. If we assume all of them to have been proven, yet they are not sufficient to establish that Garner killed Smith. For instance, we may assume he carried on a clandestine love affair with Smith's wife; he wrote her telephone numbers on the book; he called her "Grace"; he was her friend, and

carried her to the fortune teller in Staunton; he had a bruise on his face the day after the tragedy; his ring finger may have been injured and swollen, and he may have on other occasions visited Mrs. Smith at her home. Garner may have fabricated his alibi, and he may have sworn falsely when on the witness stand, but all of these combined fail to meet the legal requirement of proof beyond a reasonable doubt. The evidence of Mrs. Rhodes having been discarded as incredible there remains no .evidence in the record that Garner was present when the tragedy occurred. This, of course, was essential. No witness or other evidence places him there at the time, and naturally he could not have committed the murder unless he were present.

In *Cox* v. *Commonwealth*, 140 Va. 513, at page 517, 125 S. E. 139, Judge Burks, delivering the opinion of the court, wrote:

"To convict of a crime, the jury must be satisfied from the evidence of the guilt of the accused beyond a reasonable doubt, and they cannot be so satisfied if the evidence is equally consistent with his guilt or innocence. Mere suspicion, however grave, is not sufficient to support a verdict of guilty. The evidence must be not only consistent with the guilt of .the accused, but inconsistent with his innocence. *Hairston* v. *Commonwealth*, 97 Va. 754, 32 S. E. 797; *Davis* v. *Commonwealth*, 99 Va. 838, 38 S. E. 191; *Burton* v. *Commonwealth*, 108 Va. 892, 62 S. E. 376; *Wooden* v. *Commonwealth*, 117 Va. 930, 86 S. E. 305, Ann. Cas. 1917D, 1032; *Canter* v. *Commonwealth*, 123 Va. 794, 96 S. E. 284."

In *Warren* v. *Commonwealth*, 144 Va. 669, at pages 674-675, 131 S. E. 227, Judge Burks, in delivering the opinion of the court, wrote:

"The evidence was not sufficient to support the verdict of the jury. It but raised a suspicion. All of the evidence for the Commonwealth may be true and yet the accused be not guilty.

"Notwithstanding the great weight which is properly at-

tached to the verdict of a jury approved by the trial court, this court has from time to time found it necesary to set it aside because of lack of evidence to support it. A few of the cases in which this has been done are cited by way of illustration of when it is proper to do so. *Grayson* v. *Commonwealth*, 6 Gratt. (47 Va.) 712; *Grayson* v. *Commonwealth*, 7 Gratt. (48 Va.) 613; *Tucker* v. *Commonwealth*, 88 Va. 20, 13 S. E. 298; *Tilley* v. *Commonwealth*, 90 Va. 99, 17 S. E. 895; *McBride* v. *Commonwealth*, 95 Va. 818, 819, 30 S. E. 454; *Montgomery* v. *Commonwealth*, 98 Va. 840, 36 S. E. 371; *Montgomery* v. *Commonwealth*, 98 Va. 852, 37 S. E. 1; *Montgomery* v. *Commonwealth*, 99 Va. 833, 37 S. E. 841; *Canter* v. *Commonwealth*, 123 Va. 794, 96 S. E. 284.

"We recognize the importance of the prompt and efficient enforcement of the criminal law of the State, and that a case should not be reversed by this court for mere formal errors if it is possible to avoid it, but the error here complained of is not merely formal. It goes to the very merits of the case, and a certain degree of proof is required before a man can be deprived of his life or his liberty, and this degree has not been furnished. The protection of the innocent is not less important than the punishment of the guilty. A 'wave of crime' cannot be stopped by the punishment of those of doubtful guilt. Mere suspicion, however strong, will not support a verdict of guilty. The burden is on the Commonwealth to prove the guilt of the accused beyond a reasonable doubt. *Woods* v. *Commonwealth*, 140 Va. 491, 124 S. E. 458; *Cox* v. *Commonwealth*, 140 Va. 513, 125 S. E. 139, and cases cited."

In *Nelson* v. *Commonwealth*, 153 Va. 928, at page 934, 150 S. E. 242, this was written:

"The record fails to point out the perpetrator of the crime with the clearness and certainty required by law. Can anyone say after reading the evidence, as adduced at the trial, who committed the homicide? Surely we get nothing tangible or convincing from either the record or the Com-

monwealth's brief upon which to convict the defendant of murder and to prove beyond a reasonable doubt that he, to the exclusion of everyone else, committed or participated in the crime."

It is needless to quote from all of the cases. In addition to those above referred to may be added, *Willson* v. *Commonwealth*, 160 Va. 913, at page 917, 168 S. E. 344; *Dixon* v. *Commonwealth*, 162 Va. 798, at page 801, 173 S. E. 521; *Patterson* v. *Commonwealth*, 165 Va. 734, 737, 181 S. E. 281; *Hagy* v. *Commonwealth*, 168 Va. 663, at page 666, 190 S. E. 144, and *Harrison* v. *Commonwealth*, 183 Va. 394, at page 404, 32 S. E. (2d) 136.

For the reasons stated the judgment is reversed, the verdict of the jury is annulled, and the case is remanded for a new trial if the Commonwealth be so advised and can present any additional or new evidence.

*Reversed and remanded.*