# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

THOMAS NELSON V. COMMONWEALTH OF VIRGINIA.

November 12, 1931.

Present, Campbell, Holt, Epes, Hudgins and Gregory, JJ.

The opinion states the case.

*McCue & McCue* and *J. T. Coleman, Jr.,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

On August 5, 1927, J. H. Allen was murdered in his store room at Nick's Post Office, Albemarle county. About the same time Mrs. Willie Rothwell, who lived a short distance away, was also murdered. For the murder of Mr. Allen, Thomas Nelson, a neighborhood negro, was indicted, tried, convicted and sentenced to life imprisonment. From that sentence he appealed to this court. His case will be found in 153 Va. 928, 150 S. E. 242, 243. The primary defense there made was that the evidence did not support the judgment. That claim was sustained and this court, speaking through Judge Chichester, concludes its opinion in these words:

"The record fails to point out the perpetrator of the crime with that clearness and certainty required by law. Can anyone say after reading the evidence, as adduced at the trial, who committed the homicide? Surely we get nothing tangible or convincing from either the record or the Commonwealth's brief upon which to convict the defendant of murder and to prove beyond a reasonable doubt that he, to the exclusion of everyone else, committed or participated in the crime.

"The judgment of the circuit court is clearly erroneous and should be reversed and remanded for a new trial, if the Commonwealth is so advised."

Elsewhere the court said: "The evidence points equally as strongly to any one of several other persons as it does to the accused."

Since this evidence introduced at the first trial was insufficient to convict, its further discussion beyond that necessary to connect it up with matters since developed, would be lost labor. It is still insufficient unless it has been materially strengthened. Originally the evidence of John Burton, Earl Nightengale and W. Sam Dudley was relied

upon to show that the accused was at or near Allen's store about the time of the murder. At the second trial Burton testified in substance as he did at the first. He said that the man he saw there was about the height and color of Nelson, "but he was a bigger man in the body."

It is perfectly plain that Burton did not at that time suspect that the man he saw was Nelson. He knew him but did not mention his name although he soon afterward talked with many people about his experience.

Nightengale was himself charged with this crime. He denied all knowledge of it and not until he had been in jail twenty-three days did he say anything about having seen the accused near Allen's store on the night of the homicide. He did say that about dark he carried there a stranger in his car who had with him a bundle and who walked a short distance down the road and returned with overalls on. He also said that on this occasion he warned Mr. Allen not to carry money about with him, since he might be robbed. Nightengale's identification of Nelson both at the first and second trial is positive, but this court in the first instance paid no attention to it and nothing has since occurred to increase his standing as a witness.

We are urged to give particular weight to the identification by Dudley. At the first trial, which was in February, 1928, about five months after the murder, he also testified. He said that he passed Mr. Allen's store a little after eight o'clock and saw in it someone who "looked right much like the man (Nelson). I could not say for sure." When asked how this man was dressed, he said: "From what I could see of him—there was mighty little to see, he had on a pair of overalls. I don't know whether a shirt or coat or not." He drove on and shortly thereafter heard a shot. At the last trial held almost three years after this murder, he again undertakes to describe what he saw on that occasion and said: "I taken it to be Thomas Nelson (the man in the

store) that I seen in there, but—." He was then asked this question: "You took it to be Thomas Nelson that you saw in there?"·to which he answered, "yes, sir."

At the first trail, when six months had not yet passed, he could not make his identification certain, although questioned in detail about it. If he intended at the second trial, held three years later, to make certain that which had theretofore been uncertain, with nothing but his memory to aid him, he either yielded to the power of suggestion or was dreaming. Moreover he had described the man whom he saw upon that occasion as an extraordinarily popeyed negro with overalls on. There is nothing to show that this description fits Nelson, while Nightengale, testifying for the Commonwealth, said that the stranger whom he took to Allen's store did put on overalls there within a short time after his arrival.

It is also said that Nelson had blood on his face the morning after the murder. Mr. Abbott Smith, deputy sheriff, who was then hunting evidence, took him to a garage in Charlottesville. H. W. Collins, in business there, said that he noticed a spot of blood on Nelson's face and asked him if he had been in a fight, to which Nelson replied no, that he had been shaving.

J. Z. Collins said that he saw this spot of blood and thinks that when H. W. Collins mentioned it Nelson said that it was a scratch suffered when wrestling.

Carl Terry, who also worked at this garage, heard what was said and thought Nelson answered that he had "been in a fight or something." It is worthy of note that Mr. Smith did not notice this spot of blood or if he saw it did not deem it of sufficient importance to touch upon it when testifying.

Undoubtedly in the commission of this crime, robbery was the moving cause, and it is argued that Nelson was hard up and therefore that motive had been established.

His bank account was depleted. · Many are. He owed some debts but his creditors were not more importunate than is usually the case. He had a permanent job with a salary of $80.00 a month.

Finally it is said that blood-stained overalls found the morning after the murder on a wire fence along the road leading from Nelson's home to Allen's store were Nelson's. At the first trial they were exhibited to the jury. Mr. Abbott Smith testified in chief as to their condition and said:

"Q. Take the overalls—are those the ones you found there on the fence?

· "A. Yes, sir.

"Q. Did they have anything in the pocket?

"A. They had this sack. ·

"Q. What is that?

"A. A sugar sack. I don't know whether you can find any sugar on it or not; you could at that time.

"Q. Mr. Smith, did you find any markings on those overalls; if so, what?

"A. There was a small spot of blood.

"Q. Spot of blood on them?

"A. Clot of blood on them.

"Q. What else did you find on them?

"A. Some tar and mud. The bottom of the overalls were wet and other stains.

"Q. Where?

"A. In the front. A foreign substance of some kind. I don't know what the blood spot was. It was right there; just like you cut your finger and put it on there. It was not dry at the time at all.

"Q. You say the bottom of the overalls were wet?

"A. All down here was wet (indicating) and probably up to the knee; not wet all over, but wet spots on them.

"Q. What was the nature of this night? ·

"A. It was a damp night.

"Q. You said something regarding foreign substance on it. Did you point out that?

"A. Yes; there was a streak here (indicating); some streaks down here (indicating) and down in here; then went down to about the knee, all along here (indicating); some on the pocket, right there (indicating) and I think probably some on the front pockets; I am not certain, and along up on the apron were some slight stains."

It is now claimed that these stains were from the paint on Nelson's car. On August 3rd, three days before the murder, he washed it in Moore's creek. Mr. L. W. Maupin, clerk of the Circuit Court of Albemarle county, said that he heard Nelson, on the day of his arrest, tell Mr. Abbott Smith that he had polished his car with Duco polish, No. 7; that he was then wearing overalls and while engaged in this work, sat upon the hood of his car. Mr. Smith's evidence is to the same effect. Smith further said that he had asked Nelson what had become of these overalls and was told that he did not know. Nelson, on his part, has denied that he made any such statements to these gentlemen. That he did make them, we may take as established. It further appears from the evidence that when a car like Nelson's has been exposed to the weather and has not been polished for some time it will stain a rag when this Duco polish is used. We may take it as further established that this car had been used for some time. How long before August 3rd it had been polished, does not appear. If recently there would have been no stain.

After Mr. Smith had learned the possible effects of the use of this polish, he proceeded in the late summer or early fall, of 1927, to make certain tests with it. They were so barren of results, or in Mr. Smith's judgment, so completely failed to connect up with the stains, that he made no mention of it at the first trial, and certainly neither want of

vigor nor of intelligence can be charged against those who prepared the Commonwealth's case. For more than two years these overalls with these stains on them, now claimed to be of importance, were in the custody of the authorities of Albemarle county. Any competent chemist at the University of Virginia could have identified them as Duco stained if they were so in fact, and yet no evidence of this character, though readily accessible, has been introduced. There is nothing in the testimony of any witness which shows their color or that there is any relation between them and the paint on Nelson's car. For this link we have to depend upon a statement made by the attorney for the Commonwealth in his brief, filed in reply to the petition for a writ of error.

Nelson's home is near Allen's store. By them runs a road and along this road is a wire fence, four feet from the road, on which these overalls were found. We are asked to believe that Nelson, after the murder, in an attempt to conceal evidence, and when yet unhurried, placed them there. He might as well have hung them on his door knob. No sane man would have hidden this blood stained garment on a wire fence. That he threw it there without stopping to see what had become of it is scarcely less credible. In the vernacular, it may have been "planted," certainly it proves too much. As we have already seen, another negro with overalls on was at the store a short time before the crime was committed. They may have belonged to him. At the first trial the Attorney-General argued that they did.

Nelson did not testify at the first trial but did at the second. He was examined and cross-examined until his testimony has covered seventy-five printed pages. That it is at all times clear is certainly not true and it may readily be conceded that he was not at all times telling the truth. In short he may be guilty, but conviction cannot rest upon the weakness of the defendant's case. The burden of proof

is upon the Commonwealth. This court was of opinion that the evidence at the first trial was clearly insufficient, and was also of opinion that it pointed with equal directness to several other parties. That is still true. We do not think that there has been new evidence introduced sufficient to make certain that which was theretofore uncertain. The jury itself must have had misgivings when its verdict was returned. The crime was shocking beyond expression and occasioned that indignation and resentment which justly might have been expected. The authorities spared neither time nor labor in their efforts to secure a conviction and yet the jury has brought in a verdict of twenty-five years confinement in the penitentiary or one within five years of a minimum penalty for first degree murder.

New evidence brought out at the second trial has not been sufficient to change the situation. It can be said now as was said by Judge Chichester that suspicion points to Nelson and it is still true that suspicion points to others also. In no event is it a proper substitute for proof.

A number of other errors have been assigned on behalf of the accused. It is, of course, not necessary to consider them.

The case fails for want of proof. It is reversed and remanded to the trial court with the suggestion that a *nolle prosequi* be entered. If new and definite evidence should afterwards be uncovered another indictment would then be proper.

*Reversed and remanded.*